Case number 16-1268, Home-Owners Insurance Company v. Allied Property and Casualty Insurance Company et al. Arguments not to exceed 15 minutes preside. Mr. Schmidt, for the appellants, you may proceed. May it please the Court, good morning, Your Honors. Michael Schmidt for the appellant. I would ask to reserve five minutes, Judge Box. You may. The issue of the indemnity claim by homeowners as subrogate of Onstat against WTC, and then their subsequent subrogation claim now as subrogate of WTC against Allied and AMCO, number one, they weren't properly before the Court. Number two, the Court didn't have jurisdiction of the issues. Number three, they were premature. And number four, even if they were properly before the Court and there was jurisdiction and they weren't premature, there's no way Onstat can ever meet the corporate capacity standard by driving an automobile. I'm sorry, corporate capacity, what do you mean there? The standard in the Michigan Business Corporation statute, it has to be by reason of the fact that he was a director or officer and is defined by the courts as the corporate capacity, corporate function. Okay, so that's where you're arguing that it's the individual act that has to be because he's a director or officer, not that he is being indemnified because he's a director or officer. Correct. The other reading. Okay, go ahead. So this case was filed as a declaratory action, and before the motions were argued, the insurers entered into an interim funding agreement which said that in no event shall the interim payment provisions of this agreement be offered or submitted in any manner as evidenced in the declaratory action or any alternative dispute resolution with respect to determination of coverage or priority issues. So that's very important because to be a subrogee, there has to be a payment. There was no payment that has been officially made by homeowners or by Allyn and AMCO. There was just an interim funding agreement. And the claim that was before the court was you have Onstat and you have WTC, and the issue was who insured them and in what order as the case stood then. So this is a declaratory action, is it not? Correct. You're saying you cannot have a declaratory action until the final payment is made? No. We'll get to why they didn't have standing. That's what declaratory actions are for, aren't they, to apportion liability? Correct. But as to the parties, not to non-parties, Onstat and WTC weren't even part of the case. So we have homeowners had a $500,000 primary policy which insured Onstat and WTC, and Allyn and AMCO had policies which only insured WTC, but those policies as all auto policies for a non-owned vehicle are excess. So if you look at the cases, the first case settled is the Klein-Haskell case. That was settled within the $500,000 primary policy of homeowners. Homeowners insured both WTC and Onstat. Therefore, they were the insurer. We get to the next case, which is the Bremer case. In that case, the only defendant was Onstat. He's not insured by auto owners or allied or AMCO, and therefore the only insurer would be homeowners. So what happened here is we got off that point, and homeowners filed an indemnity claim argument saying as subrogate of Onstat, they're going to enforce indemnity against WTC, and then they're going to now, as subrogate of WTC, enforce insurance against Allyn and AMCO. What's wrong with that? First, homeowners can't subrogate for Onstat because they have no assignment from Onstat. Well, they have a right under the policy of subrogation, do they not? No, that's the point I'm getting at. There was no payment. They have to make a payment. They stand in the shoes of their insured to declare. You're saying they actually have to make the payment before the subrogation right kicks in, even though liability has been determined. Correct. The policy says if we make payment on behalf of the insured, we can then enforce rights. They did not make a payment. There was an interim funding agreement, but it says right in it, it's not to be argued or asserted in any subsequent action, including this action. Counsel, if everything went procedurally the way that you now seem to say that it should, other than being down the road, is there anything that would be any different? That is, as I understand it, settlements have actually been made with the injured parties. So if everybody went back to square one and went through the minuet the way you want it to be, wouldn't we be here somewhere down the road, or before Judge Neff and then us, on the merits, the sort of corporate capacity, who really, what's really in the policies? So would there anything be any different? Is anybody's rights affected in any way because of these first three points you make? Yes. Right, how so? Our rights are completely affected. Tell me how. For two different reasons. First of all, under the way the case is set up, homeowners, our position is homeowners can't stand in the shoes of Einstein because A, doesn't have an assignment, B, they didn't pay. Doesn't have an assignment. I mean, they have a right under the policy. He doesn't actually have to sign a document that says that it's an assignment. Under the policy, they have an absolute right to subrogate. Right? Yes, but he has to. Okay, so the fact that he doesn't have an assignment is irrelevant, right? He has to do one of two things, have an assignment or be subrogated by a payment, but he can't do either one of them. No, by the policy. Pardon me? By the policy. I don't see that the policy requires a payment for subrogation. It does, Your Honor. It's right in the condition. It says we have a subrogation only on making a payment. That's what it says. I'll take a look at it. That's in every single policy. A lot of DEC actions, I can tell you, historically are filed before payments are made to adjudicate liability before payments are made. And here, when you actually have the settlement and you've got the liability adjudicated, it seems to me that it doesn't make any sense. But I will look at the policy. Do you have a citation for the section you're quoting? It's right in the condition section of the policy. Can you help us with where it is? What page? What record entry? Something of that sort might help us a little bit. How about if I give it to you in my rebuttal? Okay, fine. Again, though, in response to Judge Boggs' question, if they had paid, let's follow your contention that they did, would that have changed anything? What does that leave? Because, okay, under the MVCA, there's two ways to get indemnity. The corporation can do it, which in this case, the corporation said, we're not going to do it. They submitted a letter saying we're not going to make a voluntary payment. Or number two, the corporation here being WTC, or number two, the employee can sue the corporation and ask them to make a voluntary payment. And in this case, that didn't happen. The reason it didn't happen. The reason that it did, though, that's really Judge Boggs' question. Would you not be here? Well, I'll get to why he can't do it. He hasn't done it and won't do it. The statute says that that's the two ways you have to do it. And the statute says the only person that can do that is the director, officer, employee. Home insurance cannot do that. They're not the director, officer, employee. They have to do it. Now, why isn't he doing it? The reason he's not doing it is, and the corporation's not doing it is, because if they voluntarily pay and there's no coverage, they've got to pay the money. But that's why they go to court and get a declaratory judgment. Well, that's what, no. But they're not making a declaratory judgment. This is not between, Onstant and WTC aren't part of this case, Judge. Actually, there has been a payment, hasn't there, with the $11 million settlement? I mean, we don't know how the payment is apportioned between all you folks. But haven't the principal plaintiffs been paid? No. The plaintiffs are out of this. Have they been paid? They're paid. So there has been a payment. Okay. Your argument, there's no payment. There is a payment. No, but the point is the payment was an interim funding agreement to get rid of those cases. Well, but homeowners actually has paid money. No, but it says in the agreement that cannot be used to show they paid money because it was just to get rid of those cases. So they both front. That's what it said, Judge. That's the reason they did it that way. It's not to determine the respected liability between the insurance companies, but I don't think I'm going to ignore the fact that plaintiffs have been paid. Correct. The plaintiffs are out of this case. If there's any subsequent case. They're not just out of the case. They have been paid money. Right. They're done. They're not going to. Homeowners has paid money, so they have subrogated for at least whatever money they paid, although we don't know how much it is, but at least there is a right of subrogation because homeowners has made a payment. I know, but, Your Honor. Is that right? Yes, but the agreement that they made a payment. I don't think you even have to read me that part of the policy since you admit there was a payment. No, I'm not, Judge. The payment was pursuant to the funding agreement, which says, in no event shall the interim payment provisions of this agreement be offered or submitted in any manner as evidence in the declaratory action or in any alternative dispute resolution proceeding with respect to determination of coverage or priority issues. Sure, the interim payments have no relevancy as to the respective liabilities of the insurance companies. Sure, they're paid under reservation of rights, which is what you'd expect, and I think that's all that means. No, there was two cases pending. The insurance companies thought, we have a real problem with coverage here, but let's see if we can just put a package of money together voluntarily with no strings attached that's saying who's making the payment here just to get rid of these two underlying cases, and then we'll fight out who owes the coverage. And that's what the agreement says. So there was no official payment. That seems to be what happened, except now you're saying that it shouldn't have happened. No. There should have been some other dance before we could get to it. No. What I'm saying is that after that happened, then there should have been a determination as to who owes what. And what happened is the parties weren't all before the court. So how can the court have ruled that Onstat is entitled to indemnity from WTC when WTC was not a party to the case? No one represented WTC. Homeowners comes into the case and says, first of all, we're subrogate of Onstat to sue WTC. Okay, Counselor, your time's expired. I think we get that point. Okay. You can watch your five minutes for rebuttal. You can keep going if you want, but it's going to come out of your time. I just wanted to make the additional point. The point is the corporation would have to voluntarily pay. If they voluntarily pay, the insurance policy, every insurance policy says in it you may assume no obligation, make no payment, or incur any expense without our consent except at the insured zone cost. So, therefore, if WTC voluntarily paid, they would have no insurance coverage under the homeowner policy or the allied or AMCO policies. Similarly, if Onstat sued, which he never did, that we voluntarily payment, there would be no insurance coverage. That's why in this – Onstat sued who? Onstat has to sue under the statute. Has to sue WTC. Why? Under the statute to make them voluntarily contribute to the settlement. But doesn't that conflate two things? One is I understand, and it is insurance policies about voluntary payments without permission, but they had, which they didn't dispute, an obligation to indemnify Onstat. Under the bylaws. But, no, only if it meets the standard of by reason of the fact, and it never has been applied to an accident case, ever, in any single case. Never been applied to what? Good faith, I guess. No. Somehow that was an intentional malicious conduct of the vice president of the corporation, and, therefore, it was not within corporate business, and, therefore, he was not driving a good faith, and, therefore, that's rather ridiculous. No, the cases say that it has to be an act in the course of exercising the corporate powers. He wasn't going to an interview, was he not? Pardon me? He was driving to an interview. Yes. That was corporate business, wasn't it? No, that's not what it means. No, was he going to an interview? He said he was going to interview a prospective employee. Sure, and he ran a stop sign. Negligently. The case – yes, yes, Your Honor. All right, so negligence is intentional misconduct under your view, and, therefore – No, that's not what I'm saying at all. I'm saying that there's never been a single case anywhere in the country that has applied this corporate capacity test to any kind of an accident, an auto accident, boat accident, premises accident, any kind. It has to be some act where the corporate powers were used or necessary for the commission of the activity. You don't think driving to the interview was part of his business as a vice president of the company? No, it has to be. It has to be critical to and instrumental in carrying out the scheme in which he participated. Don't you think they have to hire employees in this company? No, it should involve the exercise of judgment, discretion, or decision-making authority on behalf of the corporation. What are you reading from, counsel? Pardon me? What are you reading from? These are the Delaware cases cited in my brief, and I've cited 10 cases from Delaware, Maryland, Florida, Massachusetts, New York. This language that's in the Michigan Business Corporation statute is in the model corporation statute. It's been interpreted by these cases, and these cases all apply to situations where it's a corporate-type decision. It's not driving a car or a boat or anything like that. The cases in the brief are, for example, improper fees from a third-party financial institution, an agent entering into a lease, an agreement with a parent corporation during a merger, breach of fiduciary duties, personal guarantees to a bank, breach of fiduciary duties with respect to business relationship, breach of warranties at time of a merger. There isn't a single case anywhere in the country which ever found that driving a car, a boat, or any kind of an accident has ever been found to be within this corporate function test. But the identification provision was very broad. In fact, I think it's stated in there that they wanted it to be as broad as allowable by law. Right, exactly. And the law says it has to be by reason of the fact of exercising the corporate powers. Did you raise any of this before Judge Neff? That's the entire argument. It has to be within the corporate powers. But you're saying that it's only by reason of the fact that he was a director officer? That's exactly what the statute says. You say you raised that before Judge Neff? Yes. All right. Has he used all of his extra five minutes yet? Yes, Your Honor. All right. Thank you, Counsel. Your time expires. Thank you, Your Honor. Your Honors, if it please the Court, Frederick Baker on behalf of homeowners. And if I may, a personal note, Judge Griffin, it's good to see you again. You could raise both the podium and your voice. I will do that. Or at least the two would go together. I want to begin by correcting one of several misstatements by counsel. And it's perhaps understandable. He was not counsel in the trial court. Mr. Calamaros was. I know Mr. Schmidt, and I know his co-counsel, a fine young man. And Nate Tiplinski, clerk for Justice Kelly, and he's doing a fine job. But the arguments that have advanced are terrible. First, the contention by Mr. Schmidt that by reason of the fact that argument was raised before Judge Neff, not so. It was never raised. It's raised for the first time on appeal. Second, Mr. Schmidt has mistakenly represented to this court that no court has ever addressed a question involving tortious conduct. Certainly most of the cases looking to whether there is a sufficient nexus to satisfy that by reason of the fact that requirement of section 1566 involve corporate actions, borrowing money, making agreements, and so forth. But the Witko case in our brief at page 44 and 45. That's a Third Circuit case? Yes, Your Honor. And thank you. It means you are aware of it. The courts have interpreted this, and this is West against Balfour Beatty Construction at page 44. The case is broadly interpreted by reason of the fact to require no more than a nexus between the corporate officers and directors' official activity. Official activity. And the matter for which indemnification is sought. This was official activity. He was going to interview and ultimately did hire the person he interviewed for a job. The Witko case. Are you saying that that case was an accident case? No, the Witko case now at page 45. And I've misstated the page number. 45 of my brief. And also page 46 is one in which the corporate officer was sued and personal liability was sought to be attached to him for his conduct of a waste disposal facility, his conduct of operations there, for which he then sought indemnification. His personal liability was for tortious conduct. Okay, so it was tortious conduct but not an accident. It wasn't a real accident, but it's conduct damaging the environment. I think it's close enough to demonstrate that when there is conduct of that sort and there is a sufficient nexus between the official capacity in which the person acts, indemnification is proper. Does it also make a difference in this case because this is sort of a two-person operation, isn't it? Well, certainly there are. And so with a two-person operation, even though you're a director, you're also sort of a chief cook and bottle washer. Whatever needs to be done, one of the two of you has to do, it seems to me. So that makes something that I know the typical director's liability case or the director's liability policy, it's something that they do in a director's capacity. But here this language is broad enough to cover what happened here, it seems to me. I agree with you. And so I would observe that WTC is actually a fairly large outfit. There are two principles. Yeah, two principles. It's closely held. Yeah, I know. But I do need to correct one other misstatement. And, Your Honors, I will tender. There are exhibits W through Z of the concise statement of facts. If Your Honors wish to see them, I can tell you the page numbers. They're in the record, right? From the record. They're 1488 through 1500. We're aware. There was payment. The interim funding agreement, interestingly enough, from which counsel was reading, is one that we all agreed, I don't care. I have it here, and you're welcome to have it if he will stipulate to provide it to you. I'd love to have you see it, quite frankly. But Allied insisted it be a secret, and yet he's been reading from it. But he's been misinterpreting what it means. Certainly nothing in that agreement establishes liability. That's what we agreed. Or a priority of coverage. But that agreement merely said it would be. Well, cutting to the chase. To the chase. There has been payment. Well, the reason I'll ask you, because I didn't think I got much of an answer from him. That's my question. I said, okay, suppose we went through all the procedural dance. Where would we be? Would we be any different? And the only thing I heard, I mean, A, you can give me your own answer, but he seemed to be saying that in some way WTC would either be worse off or would be put to a choice about making the payment or not. So can you, A, give me your view, and, B, what do you think he's trying to say? Well, it's complete wishful thinking, Your Honor. The short answer is homeowners stands in Onstott's shoes, because as Judge Griffin pointed out. When I said, you know, go back and do the dance, what it means is that the injured people sue Onstott. Onstott settles in the same ways that we've done here. Homeowners goes after WTC. So what, I mean, would anything be any different? No, it would not. And that's the short answer. And then sort of tell me about how WTC would be exactly the same, because that's where he seemed to be saying that WTC would be in either more peril or put to a choice. Well, Mr. Calamaros, their trial counsel, engaged in some bullying tactics. He said if you make a payment, if you agree that indemnity is called for, you being Onstott and WTC, yes, if you, the insured, agree that indemnification is required, you will have prejudiced us and you will have made a voluntary payment and we will have no more coverage. So WTC very wisely, with good counsel, said nothing except we call upon you to perform your obligation under the policy. Onstott demanded payment by WTC. He demanded indemnification in writing. It's in the exhibits. And WTC, in turn, called upon Allied and AMCO, their one company, their nationwide, to pay. And that was their response. Do you have a cite for Mr. Onstott's demand letter? I do. And I can... I don't think I have it in my notes. Hang on just a second. And while I'm looking for it, if I may continue while I'm looking for it. So the point is that since WTC has called upon Allied to perform, Allied now has a duty to perform under its policy. And that's the part of this case that Mr. Schmidt never acknowledged. The policy, his policy, Allied's policy, makes this coverage under the Allied policy primary. And it's precisely because... That's because of the clause about it being an insured contract. That's correct. Or BEC, I have that here. Yes. And I'm getting to the... Let me try this because I'm trying to come up with a theory to help them or at least advance my understanding. All right. So you say Onstott called on WTC. Yes. Okay. If this were a real... If it had gone through a real series of lawsuits, would Allied then have been in a position to defend WTC against that demand? In other words, they say... I mean, they're sort of saying now either because the Michigan Corporation law isn't right or because of... They also sort of say it isn't really an insured contract. Would they not have been in a position to say to Onstott, we're not going to indemnify you because of these merits arguments? Well, I think you're referring to Mr. Schmidt's contention that if the suit isn't brought by the officer in court, the court has no jurisdiction. No, I'm trying to get to the merits, and I thought they said in effect what I would call a merits argument, which says it isn't really an insured contract under our terms or the Michigan Corporation Act only extends so far as if you did it as a director. I mean, literally doing his last argument about that. If we accept that he can even raise that. But as a matter of thought, would not the insurance company be able to raise those on behalf of WTC as a defense to Onstott's demand? Certainly, and in this action, Allied could have raised that argument on behalf of WTC, which had called upon it to indemnify it to perform under its agreement, but it failed to do so at the trial court level. It's only been raised on appeal, so it's not a preserved argument, but even if the court is willing to exercise its discretion to consider it, it's not a meritorious argument, and certainly has no merit, because having called upon Allied to perform its obligation, WTC has done all it needs to do to trigger the insured contract coverage under the policy. The policy covers insured contracts. This indemnification agreement is the maximum permitted under Michigan law, and I think the argument that you want me to circle around to is whether this is a conduct that is permitted to be indemnified under Michigan law, and yes, of course it is, because this is simply negligent conduct. It's the very essence of the kind of conduct for which it may be indemnified. He stops and robs a liquor store or kills his mistress. No coverage then. That's intentional wrongdoing. That's willful or wanton misconduct. Back as a follow-up to the point you were exploring with Judge Boggs, stating in another way a subrogee can raise defenses that the insured actually might not want raised. He's not limited by what the insured might want. Isn't that correct? Yes, that is correct. Let's just follow that. But as a practical matter, in this declaratory action, didn't they get the opportunity to raise those selfsame objections that they might have urged as the subrogee, to wit, going to interview isn't what's covered? They really got to explore those in the declaratory judgment action, didn't they? Certainly Allied would have been entitled to, and it has attempted to do so on appeal. It did not in the trial court. It could have raised any argument that was available to WTC in opposition to the claim for indemnification that homeowners asserted by standing in Onstat's shoes after having paid to release him from all liability and having a contractual right. Because if WTC didn't have to indemnify Onstat, then you would be on the hook and that would be the merits result. That's correct. And I'm sorry, I'm groping. We can look it up if we have to. It's still on your time. What I mean is you can use your time. Well, I would like to point out some facts that have not been acknowledged and that are critical. First, and I think we've established this, homeowners has this contractual right that you've recognized, Judge Griffin, to assert Onstat's right to indemnification. Onstat had a contract for indemnification, which hasn't been addressed at all under WTC's bylaws. Onstat demanded indemnification under WTC's bylaws, and WTC in turn demanded that Allied fulfill its duty under its policies. The policies define an insured contract to include a promise to answer for the tort liability of another. And that tort liability of another is for a non-insured, and that's what Onstat is. He was not insured under Allied's policy because he's driving his own vehicle. That's critical. If he'd been an insured, we would be on the hook. He was not an insured. Allied policies make that insured contract coverage primary, which means if we pay, we stand in Onstat's shoes, we demand indemnification from WTC, and WTC has the right to say our coverage for this indemnification is primary. Pay them. The settlements extinguished the liability of all parties, and Allied was a party to those settlements, and that again exhibits W, X, Y, and Z. Allied is released. AMCO is released. They consented to these. The no action clause does not apply. I have one second. And the parties all agreed that declaratory relief was appropriate. I'd love to talk to you all day. Okay, counsel. Judges have any further questions? Okay, thank you. The case will be submitted. Clerk may call the next case.